[Cite as *State v. Abdulrahman*, 2011-Ohio-1931.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
### No. 95159

## STATE OF OHIO

PLAINTIFF-APPELLANT

vs.

## ABDULRAHMAN ABDULRAHMAN

DEFENDANT-APPELLEE

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-529060

**BEFORE:** Kilbane, A.J., Sweeney, J., and S. Gallagher, J.

RELEASED AND JOURNALIZED:   April 21, 2011

ATTORNEYS FOR APPELLANT

William D. Mason
Cuyahoga County Prosecutor
Katherine Mullin
Assistant County Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ATTORNEY FOR APPELLEE

Oscar E. Rodriguez
75 Public Square
Suite 1414
Cleveland, Ohio 44113

MARY EILEEN KILBANE, A.J.:

{¶ 1}   Pursuant to Crim.R. 12(K), the plaintiff-appellant, state of Ohio, appeals from the judgment of the trial court that ordered the suppression of evidence obtained against defendant-appellee, Abdulrahman Abdulrahman, following a suppression hearing for defendant and codefendant, Muthana Hussain.   For the reasons set forth below, we affirm the order of the trial court.

**{¶ 2}** On September 28, 2009, the defendant, Al Abdullah Sowal, Saleem Hussain, Muthana Hussain, and Ashraf Abdo were indicted in connection with the controlled delivery of a large shipment of marijuana. In Count 1, defendants were charged with possession of at least 20,000 grams of marijuana. Count 2 charged them with possession of at least 20,000 grams of marijuana, and Count 3 charged them with possession of criminal tools. All counts also contained specifications for the forfeiture of a cell phone, a handgun, a 1998 Ford automobile, and $2,720 in currency.

**{¶ 3}** Defendant pled not guilty to the charges. On February 26, 2010, he filed a motion to suppress statements and evidence obtained from the search, arguing that he was subject to an illegal search and seizure. On March 4, 2010, Muthana Hussain also filed a motion to suppress. The trial court held a hearing on the motions for both defendants on May 12, 2010. The State presented testimony from Cleveland Police Lieutenant Michael Connelly, Detective Franklin Lake, and Detective Scott Moran.

**{¶ 4}** Lieutenant Connelly testified that he is with the package interdiction team ("PIT") of the narcotics unit of the Cleveland Police Department. This unit checks packages that are mailed through the United States Postal Service, FedEx, United Parcel Service, and other couriers to determine if they contain illegal drugs. Officers assigned to this unit work with K-9 drug sniffing dogs that have been trained to detect the odor of various drugs. In accordance with the PIT's protocol, certain packages are subjected to the K-9 drug dog that

"alerts" the unit if it has detected drugs. After such alert or "positive hit" from the dog, police officers from the team obtain a search warrant to open the package, and the contents of the package is verified for illegal drugs. The package is then resealed, and an "anticipatory warrant" is obtained for the location to which the package is to be delivered. The PIT unit may then arrange a controlled delivery of the package in order to arrest the intended recipient.

{¶ 5} On the morning of September 18, 2009, Lieutenant Connelly assisted the PIT unit with surveillance during a controlled delivery to apartment #302 of the Clifton House Apartments, located at 11212 Clifton Boulevard, in Cleveland. Lieutenant Connelly did surveillance on the street and watched for vehicles as Detective Lake made a controlled delivery to the apartment. Other officers were stationed in the hall just outside apartment #302.

{¶ 6} A red Ford Escort was circling the area and appeared to be watching the delivery vehicle. The passenger exited this vehicle and went into the apartment building. The controlled delivery was completed at apartment #302. After receiving information that the package was intended for the driver of the red Ford Escort, codefendant Muthana Hussain, Lieutenant Connelly arrested Hussain.

{¶ 7} The officers searched Hussain's vehicle. They obtained a cell phone and determined that Hussain's address was 1300 West 9th Street – #1002, Cleveland, Ohio. The vehicle was then towed, and the officers completed their search of apartment #302 of the

Clifton House.

{¶ 8} Lieutenant Connelly testified that at around noon, the officers then proceeded to the Bridgeview Apartments, located at 1300 West 9th Street in Cleveland, to find "more evidence of drug activity or proceeds." Lieutenant Connelly used the keys he had obtained from Hussain to enter the West 9th Street apartment building. He then identified himself as a police officer and asked a security officer in the apartment lobby about the occupants of apartment #1002. At that moment, defendant was stepping out of an elevator and the security officer identified him as the occupant of that apartment. Lieutenant Connelly then followed him. The defendant held the lobby door open for Lieutenant Connelly, and they continued to walk to the outer door. Lieutenant Connelly then identified himself as a police officer and spoke with defendant.[1]

{¶ 9} Lieutenant Connelly testified that he informed defendant that he was completing a narcotics investigation and asked him if he knew Hussain. Defendant stated that Hussain is his cousin. Lieutenant Connelly then testified that he asked "him about his legal status in this country." (Tr. 125-126.) During direct examination of Lieutenant Connelly he was asked, "[a]t any time during this conversation did you do anything?" He replied, "[t]he longer I'm standing there, I'm by myself; I am conducting a narcotics investigation. At some point I tell him I'm going to handcuff you, and I end up handcuffing him for my own protection. * * *

---

[1]Images of the encounter were recorded by a security camera.

During my conversation with defendant, he told me I could go upstairs to his apartment; he said his cousin was up there, we could talk to him and at that time I believe we were going to apartment 1002."

{¶ 10} Lieutenant Connelly called for backup and, within seven minutes, Cleveland Police and Immigration and Customs Enforcement Officials arrived, and they entered the building with defendant.

{¶ 11} Lieutenant Connelly further testified, "[a]s we were walking up the hallway, security also came out of another elevator and [security told] me they didn't live there anymore, the defendant told me, you know what, that's correct, we live in 806. I made a mistake. We go down to 806, we're standing outside. He's like my cousin is in there, we can go in and talk to him. We used keys that he had on his person to open up the door of 806 and we entered. * * * [Inside the apartment in plain view,] there was a box which was very similar to the box that we had just delivered."

{¶ 12} The officers then secured the apartment and obtained a search warrant for this second box and learned that it also contained marijuana. The officers also went to a third location and recovered a third box of marijuana at that location.

{¶ 13} Lieutenant Connelly admitted on cross-examination that he patted defendant down, removed his watch, and handcuffed him. He also obtained defendant's keys.

{¶ 14} Detective Lake testified that it appeared that the person in the red Ford Escort

was waiting for delivery of a package.

{¶ 15} Detective Moran testified that he was conducting surveillance in the hallway outside apartment #302 of the Clifton House. After the controlled delivery, someone from inside the apartment signed for the package. A few minutes later, codefendant Sowal entered the apartment then exited carrying the box. The officers arrested him and read him his rights. The officers then proceeded to the West 9th Street apartment. Detective Moran asserted that the officers were invited into the apartment, and also learned that a third package of marijuana had also been sent to another apartment building.

{¶ 16} Defendant testified that at around 11:35 a.m., he was inside his apartment watching television. He then left to get something to drink from a vending machine at an adjacent building. As he exited the doors from the lobby to a foyer, a man was behind him, and put his hand upon him. According to defendant, Lieutenant Connelly pushed him with one hand, displayed a badge, and arrested him. Defendant asked what was happening and Lieutenant Connelly asked if defendant knew anything about drugs. He then frisked defendant and refused to let him leave. The officer then took defendant's keys. Other officers arrived and brought defendant back into the building. The officers took defendant to the tenth floor. First they went to apartment #1002. They checked this apartment and determined that it was clear. The security officer then informed the police that they were at the wrong apartment. They then took him to apartment #806 and opened the door.

{¶ 17} At that point, according to defendant, the officers asked if they could enter and defendant stated that they could not. They then ignored defendant and entered the apartment.

{¶ 18} The trial court subsequently denied the motion to suppress as to Muthana Hussain, but granted it as to defendant, concluding that the initial stop of defendant was "unwarranted, whether as a *Terry* stop or as an arrest, and everything that flowed from that encounter must be suppressed as the fruit of the poisonous tree." In a written opinion, the trial court provided a detailed factual and legal analysis and stated as follows:

> "* * * Lt. Connelly followed [defendant] out of the building and engaged him in conversation. He asked him if he knew Muthana Hussain and was informed that they were cousins; he also asked Abdulrahman if he was a legal resident of the United States, and was told he was not.
>
> According to testimony, Abdulrahman was polite and co-operative. Moreover, Lt. Connelly stated that he did not recall asking him about any drugs. Nevertheless, Lt. Connelly patted him down and handcuffed Abdulrahman. The transcript of the cross-examination of Lt. Connelly demonstrates the sequence of events:
>
> Q. Obviously at this point in time he's not free to leave.
>
> A. Absolutely.
>
> Q. And you hold him there for up to I think seven minutes, correct, until your back up arrives?
>
> A. It's seven minutes from my initial encounter until we were walking back into the building.
>
> Q. Alright. And at this point in time you still don't have any evidence to

suggest that my client was involved in any drug trafficking operation. Is that fair?

A.      Just the fact that he lived in the same apartment that I suspected that Hussain lived in.

* * *

Lt. Connelly initially concurred with counsel that, while they were still outside the building, Abdulrahman was already in custody (Tr. 90), although he subsequently claims that Abdulrahman was merely 'being detained.'   (Tr. 91).   The Court finds that — however the State may choose to characterize the situation — when an individual is stopped by a police detective, questioned, patted down, and placed in handcuffs, he is in custody: That is, under arrest * * *.

* * * Connelly lacked specific facts from which he could form a reasonably articulable belief that Abdulrahman was engaged in — or about to engage in — any criminal activity.   When he stopped the defendant, all he knew was that Abdulrahman had been identified by the person at the security desk as someone who resided in Apartment 1002, which is where he '* * * suspected that Hussain lived in.'

Everything else that Lt. Connelly learned from Abdulrahman thus stemmed from this illegal stop: that he and Muthana were cousins, that they lived together in Apartment 806, and that his other cousin, Saleem Hussain, was in that apartment [806] taking a shower.   But for that information, Connally would not have entered the apartment and thus would not have seen the box sitting in plain view in the kitchen.

The information learned as a result of this encounter further formed the factual basis for the Affidavit signed by Det. Neil Hutchinson in support of a search warrant for the premises at 1300 West 9th Street, Apt. 806."

{¶ 19} The State now appeals and assigns the following error for our review:

"A trial court errs in granting a motion to suppress where a defendant gives consent to search after a consensual encounter and a valid investigatory stop."

{¶ 20} Within this assignment of error, the State argues that during Lieutenant Connelly's initial discussions with defendant, to the time that defendant gave Lieutenant Connelly permission to enter apartment #806 to speak with his cousin, defendant was free to leave. The State further maintains that Lieutenant Connelly had reasonable and articulable suspicion to stop defendant and "investigate [his] connections to criminal activity," because the police had just arrested Muthana Hussain, and the defendant shared an apartment with him.

{¶ 21} An appellate court's review of a ruling on a motion to suppress presents mixed questions of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. This court defers to a trial court's factual findings where they are supported by competent, credible evidence. Id. See, also, *State v. Brooks*, 75 Ohio St.3d 148, 1996-Ohio-134, 661 N.E.2d 1030. "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Burnside,* citing *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.

{¶ 22} The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

{¶ 23} Evidence that law enforcement officers obtain following a violation of the Fourth Amendment must be excluded from evidence. *Mapp v. Ohio* (1961), 367 U.S. 643,

655, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

### 1. Consent

{¶ 24} A search that is undertaken following valid consent is constitutionally permissible. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. In order to be valid, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. *Florida v. Royer* (1983), 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229. Moreover, the issue of whether consent was validly given is a question of fact to be determined by the totality of the circumstances. *Schneckloth* at 227.

{¶ 25} Consent is validly established where the officers approach an individual on the street or in another public place, ask him if he is willing to answer some questions, and put questions to him if the person is willing to listen, where the individual is free to decline to listen to the questions at all and may go on his way. Id.

{¶ 26} Consent may not be not be coerced by explicit or implicit means, or by implied threat or covert force, and it is not established where the individual merely submits to a claim of lawful authority. Id. Therefore, if the officer makes a show of authority sufficient to communicate to a reasonable person that he was not free to leave, the consent to search is not voluntarily given. *State v. Ingram* (1992), 82 Ohio App.3d 341, 344, 612 N.E.2d 454. In

*Ingram*, the court determined that consent was not freely and voluntarily given where the officers were in uniform and wearing guns, they approached the defendant on private property, stood close to him, blocking his exit, told him they were looking for someone selling drugs from that house, and did not tell him that he had the right to refuse to be searched.

{¶ 27} In this matter, the trial court noted that Lieutenant Connelly conceded on cross-examination that, "while they were still outside the building, Abdulrahman was already in custody." The trial court concluded that this was "at the very least, a *Terry* stop." The trial court therefore rejected the State's assertion that a consensual encounter had occurred.

{¶ 28} We find that determination to be supported by competent, credible evidence. The totality of the circumstances fail to demonstrate that defendant consented to the search of his apartment. The officers did not simply approach defendant on the street or in another public place, ask him if he is willing to answer some questions, and put questions to him. Rather, defendant was immediately accosted and seized, and was not free to leave. The record demonstrates that defendant was patted down and handcuffed immediately, and was not free to leave. Any "consent" was simply a submission to the force and was coerced. He was not free to exit the building, and did not immediately tell the officers that he lived in apartment #806 rather than apartment #1002.

{¶ 29} In accordance with the foregoing, the trial court's factual findings are supported

by competent, credible evidence and the court properly concluded that Abdulrahman did not engage in a consensual encounter with Lieutenant Connelly and did not give valid consent to search the apartment.

## 2. The Stop of Defendant

{¶ 30} Where the officers stop an individual, the stop may be justified as an investigative or *Terry* stop if the officer observes facts giving rise to a reasonable, articulable suspicion of criminal activity and the officer can articulate specific facts that would warrant a reasonable person to believe that a crime has been committed or is committing a crime. See, generally, *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry*, police officers may temporarily detain individuals in order to investigate possible criminal activity as long as the officers have a reasonable, articulable suspicion that criminal activity may be afoot. Id.

{¶ 31} "Reasonable suspicion" entails some minimal level of objective justification for making a stop; this is something more than an inchoate and unparticularized suspicion or "hunch," but something less than the level of suspicion required for probable cause. Id. The existence of reasonable suspicion is based upon an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture — a totality of the surrounding circumstances. *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271.

{¶ 32} In this matter, the trial court concluded:

{¶ 33} "* * * Connelly lacked specific facts from which he could form a reasonably articulable belief that Abdulrahman was engaged in — or about to engage in — any criminal activity. When he stopped the defendant, all he knew was that Abdulrahman had been identified by the person at the security desk as someone who resided in apartment #1002, which is where he '* * * suspected that Hussain lived.'"

{¶ 34} The trial court determined that there was no reasonable, articulable suspicion of criminal activity as the officers could not articulate specific facts that would warrant a person of reasonable caution in the belief that defendant had committed or is committing a crime. The officers simply learned that Abdulrahman resided with Hussain, and that Hussain was the recipient of a large amount of drugs.

{¶ 35} In accordance with the foregoing, the trial court's factual findings are supported by competent, credible evidence, and the court properly concluded that there is no basis for a *Terry* stop in this matter.

### 3. The Restraint of Defendant

{¶ 36} If police officers restrain the individual, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment is invalid unless justified by probable cause. *Royer*, citing *Dunaway v. New York* (1979), 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824. In determining whether a "seizure" rather than a *Terry* stop has occurred, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his

situation." *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317. A suspect is "in custody" when a reasonable person in his place would not feel free to leave or go where he pleases. *Oregon v. Mathiason* (1977), 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714. The test for determining if a seizure is an arrest rather than a *Terry*-type detention is if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree that the law associates with formal arrest. *Yarborough v. Alvarado* (2004), 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938; *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304.

{¶ 37} In this matter, the trial court noted that Lieutenant Connelly concurred with counsel that, while they were still outside the building, Abdulrahman was already in custody and the court found that defendant had been stopped by a police detective, questioned, patted down, and placed in handcuffs, so he was in custody and clearly not free to leave, and our review of the record supports that determination. There is competent, credible evidence that defendant was seized and in custody. His freedom was restrained and no reasonable person in similar

{¶ 38} circumstances would have understood that he was free to leave following this encounter.

{¶ 39} In accordance with the foregoing, the trial court's factual findings are supported by competent, credible evidence and the court properly concluded that defendant was not

simply being detained but was seized and in custody.

### 4. The Officers' Independent Information

{¶ 40} If knowledge of derivative evidence is gained from a source independent of the government's prior illegality, the derivative evidence need not be excluded. *State v. Myers* (1997), 119 Ohio App.3d 376, 695 N.E.2d 327, citing *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. Under this rule, evidence that is not discovered during an initial illegal entry by police, but rather is discovered subsequently pursuant to a valid search warrant issued on information not connected to the prior illegal entry, is derivative evidence for which there is an independent source, and such evidence should not be suppressed. Id., citing *Segura v. United States* (1984), 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599.

{¶ 41} In this matter, the trial court concluded that "everything else that Lieutenant Connelly learned from Abdulrahman * * * stemmed from this illegal stop: that he and Muthana were cousins, that they lived together in apartment #806, and that his other cousin, Saleem Hussain, was in that apartment taking a shower. But for that information, Connelly would not have entered the apartment and thus would not have seen the box sitting in plain view in the kitchen. * * * The information learned as a result of this encounter further formed the factual basis for the Affidavit signed by Det. Neil Hutchinson in support of a search warrant for the premises at 1300 West 9th Street, Apt. 806."

{¶ 42} The record contains competent, credible evidence in support of the trial court's conclusion that there was no knowledge of derivative evidence from a source independent of the government's prior illegality. By improperly using the key and magnetic card that he had obtained from Hussain, Lieutenant Connelly entered the lobby of the 1300 West 9th Street apartment building, confronted defendant, and placed him in custody. The officer was then able to gain entry into defendant's former apartment and present apartment, where he observed a box of suspected marijuana. Although the officers had some information based upon their surveillance, they would not have known that defendant moved from apartment #1002.

{¶ 43} The record supports the trial court's determination that there was no derivative evidence from an independent source, and the search of the box following the stop of defendant was properly suppressed as the fruit of the poisonous tree.

{¶ 44} In accordance with all of the foregoing, the trial court properly suppressed all evidence obtained following the seizure of defendant.

{¶ 45} The assignment of error is without merit and overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

JAMES J. SWEENEY, J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS IN JUDGMENT ONLY (SEE SEPARATE CONCURRING OPINION)

SEAN C. GALLAGHER, J., CONCURRING IN JUDGMENT ONLY:

**{¶ 46}** I concur in judgment only with the majority opinion. I respectfully disagree with portions of the analysis offered by the majority relating to the point at which Abdulrahman was illegally detained and from what point statements by Abdulrahman would be deemed inadmissible.

**{¶ 47}** In my view, Lt. Connelly was justified in stopping and initially questioning Abdulrahman during the encounter in the lobby of the apartment building. Whether characterized as a consensual encounter or a "*Terry* stop," Lt. Connelly had enough independent information to question Abdulrahman. Further, I take no issue with Lt. Connelly's using the key recovered from Hussain to gain initial access to the common area of the apartment.[2]

_____
[2]The entry to the apartment building common area by Lt. Connelly through

{¶ 48} The voluntary statements of Abdulraham acknowledging Hussain was his cousin and that they lived together in apartment #1002, quickly "morphed" the initial encounter into a "*Terry* stop." That information, along with the information garnered from the arrest of Hussain and the comments of the security guard, in the context of a drug trafficking investigation, justified Lt. Connelly in "patting" down Abdulrahman for weapons. At this point, under *Segura v. U.S.* (1984), 468 U.S. 796, 104 S. Ct. 3380, 82 L.Ed.2d 599, the police could have detained Abdulrahman, without handcuffs, for the warrant to either apartment #1002 or apartment #806 based on confirmation from the security guard that the suspects had moved to this location. In any event, Lt. Connelly went further and handcuffed Abdulrahman, effectively placing him under arrest without probable cause. The state's assertion that this was done for the safety of the officer working alone falls short when it is clear Abdulrahman was searched and transported in handcuffs back up to apartment #1002 and then subsequently to apartment #806 after the arrival of backup officers. Even if the officers gained "consent" from Abdulrahman, it was done after he was illegally detained and effectively arrested.

{¶ 49} In my view, the majority errs in adopting the trial court's conclusory determination that all information derived from this initial encounter was improper and must

---

the use of the key recovered from Hussain was not the basis of the trial court's order granting the suppression. The trial court focused on the purported "consent" given by Abdulrahman after being detained.

be suppressed. Abdulrahman did not have to disclose that he lived in apartment #1002 or that Hussain was his cousin. These responses were voluntary. Only information obtained after Abdulrahman was handcuffed is subject to suppression under these facts. Thus, the information garnered through the arrest of Hussain, the recovery of documents from Hussain's vehicle identifying the apartment building, the cell phone data, and the comments of the security guard establish that probable cause for a warrant existed independent of the illegal detention of Abdulrahman and the subsequent observations of police officers after illegally entering the apartment.

{¶ 50} We are unable to assess whether an independent basis for the search of apartment #806 existed separate from Abdulrahman's purported consent. A copy of the actual search warrant was not contained in the record before this court. Nevertheless, even if an independent basis existed, and it appears there was more than sufficient evidence to obtain a warrant, the unlawful entry into the apartment without a warrant so poisoned the process that the subsequent search cannot be justified.

{¶ 51} Thus, I would concur in judgment only with the majority.