[Cite as *State v. Arafat*, 2016-Ohio-385.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 102662

---

### STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

### MICHAEL ARAFAT

### DEFENDANT-APPELLANT

---

### JUDGMENT:
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-589230-A

**BEFORE:** Jones, A.J., Keough, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** February 4, 2016

**ATTORNEYS FOR APPELLANT**

Mark B. Marein
Michael I. Marein
Marein and Bradley
Leader Building 222
526 Superior Avenue
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Patrick J. Lavelle
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., A.J.:

{¶1} Defendant-appellant, Michael Arafat ("Arafat"), appeals the trial court's denial of his motion to suppress.    We affirm.

Procedural History and Facts

{¶2} In 2014, Arafat was charged with trafficking in drugs with a major drug offender specification, possession of drugs with a major drug offender specification, and possessing criminal tools.    Arafat filed a motion to suppress, which the state opposed.    The trial court held a hearing on Arafat's motion, at which the following pertinent evidence was presented.

{¶3} Detective C.J. Frey ("Detective Frey") of the Brooklyn Police Department and Sergeant Joseph Bovenzi ("Sergeant Bovenzi") of the Cleveland Police Department were assigned to the local HIDTA[1] Drug Task Force, an FBI task force that investigates major drug offenses in the Cleveland area.    HIDTA has a "HIT," or "Hotel Interdiction Team," that focuses its efforts on area hotels because drug traffickers often operate out of hotels.    Detective Frey explained that certain identifiers indicate the possibility of drug or other criminal activity, including when a suspect pays in cash, checks into a hotel without a prior reservation, extends his or her stay day to day instead of reserving several days in advance, has a local address, uses a rental car or a car registered in someone else's name, and leaves immediately after checking into the hotel.

{¶4} Detective Frey was checking the registry of the Super 8 Motel in Strongsville when he came across Arafat's name.    Detective Frey learned of Arafat through another drug investigation, knew his criminal history, and suspected that he was a "major player" in the drug

---

[1] High Intensity Drug Trafficking Areas

world. When checking Arafat's registration at the Super 8, Detective Frey noticed that Arafat did not have a reservation when he checked into the motel, paid cash, and used a local address.

{¶5} A 21-year veteran of the Cleveland Police, Sergeant Bovenzi testified that he thought Arafat was trafficking drugs out of the Super 8 based on the following indicators: he spent little time in his motel room, drove a vehicle registered in another name, paid cash for the room, and "re-upped" the room from one day to the next. Sergeant Bovenzi indicated his familiarity with drug traffickers who live locally but rent hotel rooms as "stash locations."

{¶6} Detective Frey watched Arafat's motel room for over four hours but did not see any activity. The next morning, Detective Frey and other HIDTA detectives began surveillance at 6:30 a.m. About an hour later, Arafat's SUV, which was registered in another man's name, pulled into the motel parking lot and Arafat went into his room. He left shortly thereafter, stopped in the motel office, paid cash for another night's stay, and told the clerk that his room was not to be cleaned.

{¶7} At about 3:50 p.m., Arafat returned to the motel driving the same SUV. He went into his room and came back out a couple of minutes later, carrying a bag. Arafat drove to the back of the motel, behind an adjacent ice skating rink, and into the parking lot of a nearby Holiday Inn. Arafat drove his car around in circles, in what the detective described as "cleaning," so as to make sure that he was not being followed. Arafat drove up to a man standing in the Holiday Inn parking lot and the man got into Arafat's vehicle.

{¶8} Arafat drove around, stopping several times for a few seconds each time. The detectives noted that Arafat was driving erratically at varying speeds. After two to three minutes, Arafat dropped the man off back in the Holiday Inn parking lot, and the man got into a truck and drove away. Detective Frey testified that based on his knowledge, experience, and

training he believed that Arafat was conducting a drug deal.

{¶9} Sergeant Bovenzi followed Arafat. Detective Frey contacted the Strongsville police to assist in an investigatory stop of Arafat. The Strongsville police pulled Arafat over, removed him from his car, and placed him in handcuffs. Sergeant Bovenzi arrived on scene 20-30 seconds after the Strongsville Police pulled Arafat over. Sergeant Bovenzi testified that he waited in his car until the Strongsville police had secured the suspect. He explained that he stayed in his car for safety reasons because he was dressed in plain clothes and driving a regular car and the police officers might not know him. Detective Frey arrived on scene shortly thereafter.

{¶10} Sergeant Bovenzi testified that as he approached Arafat's car, he first noticed a "fairly strong smell of marijuana emanating from the vehicle and off the person of Mr. Arafat." He admitted that Arafat was not free to leave the scene at this time. Sergeant Bovenzi informed Arafat of his *Miranda* rights and asked Arafat where he was coming from. Arafat told Sergeant Bovenzi that he had just come from the highway and was driving through the Metroparks to smoke marijuana. Sergeant Bovenzi informed Arafat that they had been following him and Arafat admitted that he met a friend, Terry, in the Holiday Inn parking lot to give him some marijuana. Arafat denied any other activity. Sergeant Bovenzi informed Arafat the police had been watching him at the Super 8 and placed Arafat under arrest for drug trafficking. Arafat consented to a search of his car and the police found a small amount of marijuana, a key card to a room at the Super 8, and some money. Arafat consented to a search of his motel room.

{¶11} The police took Arafat back to the Super 8. Arafat told the police that he had started with ten pounds of marijuana in his room, but only two to three pounds remained. At this point, Arafat changed his mind and refused to consent to the search of his room. After the

police obtained a search warrant for the motel room, Arafat admitted that there were multiple kilos of cocaine in the room and claimed he wanted to work with the police to help himself out.

**{¶12}** The trial court denied Arafat's motion to suppress, stating the following:

The motion to suppress herein having been held, the motion to suppress is denied. The Court makes the following findings for your consideration. The Court finds that this was, in fact, a *Terry* stop. That it was within the boundaries of the *Terry* conclusion. That the officers justified their actions by reasonable suspicions. The Court bases that on the following. That they — he paid cash for a room, no reservation, that he was a known drug offender, and his behavior in the parking lot. Now, if you take all of those things singularly, the Court agrees with [defense counsel] that those things would not mean anything. But if you have police officers who are specializing in the surveillance and observation of those who engage in drug trafficking offenses, then I think that you have articulable reasons for a peace officer to at least survey the circumstances and make a determination about what type of activity is taking place. Then you have admissions which were made voluntarily after being *Mirandized* by the defendant. And those admissions were made within the realm of the defendant obtaining a working relationship with the police officers. Now, notwithstanding that, they had already informed him of his rights. He was trying to negotiate with them to take them to a different place that they didn't say they were going to. They said, you know, they were interested in what was going on at the Super 8 hotel. He wanted to negotiate for something different. But the admissions were made voluntarily after he was properly *Mirandized*. And there's been nothing to indicate that he's not been properly *Mirandized* even though there were no questions asked about what his rights and what rights were reviewed with him, then the Court does assume that he was properly *Mirandized*.
In terms of the investigatory stop, the Court finds that there was a stop made. There was a smell of marijuana which also justifies reasonable suspicion. He was again *Mirandized* there. He consented to the search of his car. He asked that they be — and this guy is negotiating with the police the entire time. * * * [Y]ou can search my car but don't go to the room. * * * So in that search* * * that search amounted to a small amount of marijuana and the room key and some money. Court finds this was a proper *Terry* stop, and the peace officers conducted themselves properly. The motion to suppress will be denied.

**{¶13}** Arafat subsequently pleaded no contest to the three charges as set forth in the indictment and the trial court sentenced him to an aggregate sentence of 11 years in prison.

**{¶14}** Arafat filed a timely notice of appeal and raises the following assignments of error for our review:

I:   The trial court erred in denying Appellant's Motion to Suppress on the grounds that the *Terry* stop of Appellant was not based on a reasonable, articulable suspicion that Appellant was engage[d] in criminal activity.

II:   The trial court erred in denying Appellant's Motion to Suppress on the grounds that the seizure of the Appellant exceeded the scope of an investigatory *Terry* stop in that it resembled a traditional arrest.

Law and Analysis

{¶15} Appellate review of the denial of a motion to suppress presents a mixed question of law and fact.  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.  *State v. Carter*, 72 Ohio St.3d 545, 552, 651 N.E.2d 965 (1995); *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).

{¶16} Consequently, when reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at *id.* However, an appellate court reviews de novo whether the trial court's conclusions of law are correct, based on those findings of fact.  *State v. Anderson*, 100 Ohio App.3d 688, 691, 654 N.E.2d 1034 (4th Dist.1995).

{¶17} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide for "[t]he right of the people to be secure * * * against unreasonable searches and seizures * * *."  Searches and seizures conducted without a prior finding of probable cause by a judge or magistrate are per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *State v. Tincher*, 47 Ohio App.3d 188, 190, 548 N.E.2d 251 (12th Dist.1988).   If evidence is obtained

through actions that violate an accused's Fourth Amendment rights, exclusion of the evidence at trial is mandated. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶18} Not every encounter between a citizen and a law enforcement official implicates the state and federal prohibition on unreasonable searches and seizures. *California v. Hodari D.*, 499 U.S. 621, 626-628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (2d Dist.1995). The United States Supreme Court has created three categories of police-citizen contact to identify the separate situations where constitutional guarantees are implicated: (1) consensual encounters, (2) investigative or "*Terry*" stops, and (3) arrests. *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1982); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Lyndhurst v. Sadowski*, 8th Dist. Cuyahoga No. 74313, 1999 Ohio App. LEXIS 4079 (Sept. 2, 1999).

{¶19} In his first assignment of error, Arafat contends that the police did not have reasonable, articulable suspicion that he was involved in criminal activity to justify pulling him over.

{¶20} A law enforcement officer may properly stop an individual under the *Terry*-stop exception if the officer possesses the requisite reasonable suspicion based on specific and articulable facts that the person is, was, or is about to be engaged in criminal activity. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L.Ed.2d 621 (1981). Whether reasonable grounds for a stop exist must be viewed in light of the totality of the circumstances. *London v. Edley,* 75 Ohio App.3d 30, 32, 598 N.E.2d 851 (12th Dist.1991). That being said, at a hearing on a motion to suppress, the state bears the burden of establishing the validity of a stop. *Lakewood v. Shelton*,

8th Dist. Cuyahoga No. 95746, 2011-Ohio-4408, ¶ 13. Likewise, once a warrantless search is established, it is the state's burden to show the validity of the search. *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).

**{¶21}** "Reasonable suspicion" entails some minimal level of objective justification for making a stop; this is something more than an inchoate and unparticularized suspicion or "hunch," but something less than the level of suspicion required for probable cause. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The existence of reasonable suspicion is based upon an objective and particularized suspicion that criminal activity was afoot and must be based on a totality of the surrounding circumstances. *State v. Abdulrahman*, 8th Dist. Cuyahoga No. 95159, 2011-Ohio-1931, ¶ 31, citing *State v. Andrews*, 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991).

**{¶22}** Arafat contends that the officers did not have reasonable suspicion to pull him over and that any activity Arafat conducted in and around the Super 8 Motel could be construed as normal behavior. According to Arafat, even when looking at the totality of the circumstances, the officers could not have rationally inferred that Arafat was involved in criminal activity because the officers never saw a drug transaction take place.

**{¶23}** The propriety of an investigative stop must be viewed in light of the totality of the circumstances "as viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Andrews*, 57 Ohio St.3d at 87-88. When considering the "totality of the circumstances," police officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). A court reviewing

the officer's actions must give due weight to the officer's experience and training and must view the evidence as it would be understood by those in law enforcement. *Andrews* at *id.*

{¶24} Detective Frey testified that he had been a police officer since 1997 and a narcotics detective for eight years. For the past four years, Frey had been assigned to HIDTA on the HIT. As part of HIDTA, Detective Frey received special training. Detective Frey testified that he checked local hotels on a daily basis and was able "develop patterns and see things, * * * to see anomalies as compared to basic [hotel stays.]" He looked for certain indicators of criminal activity, which included paying cash, checking in without a reservation, and having a local address. Arafat was known to Detective Frey as a major player in Cleveland's drug trade and the detective knew his criminal history. Detective Frey found Arafat's name on the Super 8 registry and noted that he had checked into the hotel with a local address, paid cash, and left the motel immediately after renting the room. Detective Frey "deconflicted" Arafat's name, which meant that he spoke with other agencies to make sure that Arafat was not part of another investigation, and found out that the other agency investigating him had concluded their investigation.

{¶25} Detective Frey testified that Arafat paid cash for another night's stay at the motel, told the clerk not to have his room serviced, and put a "Do Not Disturb" sign on the door. The police discovered that Arafat's car was registered in another man's name and

> [o]ftentimes, for the same reason that locals will rent a room, people will use either rental cars or somebody else's cars to help avoid detection and identification. So they will, you know, drive somebody else's car so you don't know who the driver is, or they will rent a car.

{¶26} Once Arafat left the Super 8 in his SUV, "it appeared that he was driving around in circles, what we call cleaning, cleaning off or cleaning himself off, just driving around in circles,

[to] make sure [he was] not being followed." After the unknown man got into Arafat's SUV, Detective Frey testified that Arafat exited the Holiday Inn parking lot through the "main driveway * * * then turned off a couple times and stopped a couple times. Started out, pulled into a spot for ten or 15 seconds, and then moved to another spot for 10 or 15 seconds, and then drove — was driving slowly through the parking lot." Detective Frey admitted that he did not see a drug transaction take place in the car, but Arafat "was driving erratically and — and it appeared that his attention while operating the vehicle was definitely divided. He was driving slow and inconsistent, varying speeds. And, again, he had stopped at several points during this," so "[t]hrough my training and experience, I believed that a drug deal was occurring in that parking lot."

**{¶27}** Sergeant Bovenzi testified that he had been a police officer for 21 years and Arafat's actions were indicators of criminal activity. Sergeant Bovenzi observed the short duration Arafat was in and out of his hotel room, that the car was not registered in Arafat's name, that he paid for the room in cash, that he re-upped the room "from one day to the next day," and that Arafat met the other man in a location other than where he was staying. According to Sergeant Bovenzi, his training and experience taught him that drug traffickers often meet customers away from stash locations to reduce the risk the customer may burglarize or rob the stash location. Sergeant Bovenzi explained that the totality of everything he had seen and was aware of convinced him that a drug sale had occurred.

**{¶28}** We find guidance in a recent case decided by this court. In *State v. Grayson*, 8th Dist. Cuyahoga No. 102057, 2015-Ohio-3229, the defendant moved to suppress evidence under similar circumstances. The defendant, who lived out of state, had been staying at a local hotel for four days, extending his stay one day at a time, and refusing housekeeping service. HIDTA

detectives ran the defendant's criminal history and began surveillance on his hotel room. Detectives observed people coming in and out of the defendant's room and observed the defendant changing rooms. The defendant's car was also registered in another man's name. The police saw the defendant and two other men go to a discount store and exchange a large amount of cash for money orders. The HIDTA detective believed the defendant was engaged in drug trafficking and called a patrol officer to stop the defendant's car. The patrol officer found the car illegally parked in a fire lane and both the HIDTA detective and patrol officer both recognized a strong odor of marijuana.

{¶29} The defendant filed a motion to suppress, which the trial court granted, finding that the officers illegally stopped the defendant's car. This court reversed, determining that the arresting detective's experience, observations of the defendant's activity, and the defendant's criminal history gave the detective reasonable suspicion to conduct an investigative stop. *Id.* at ¶ 24. This court reasoned that once the police smelled marijuana, they had probable cause to search his car, and after they found a large amount of marijuana in the car, the police had probable cause to arrest the defendant. *Id.* at ¶ 25.

{¶30} Likewise, in this case, the facts support the trial court's finding that the police had reasonable suspicion to conduct the stop of Arafat's car. The totality of the circumstances was sufficient for the HIDTA detectives to form a reasonable suspicion that Arafat was committing a criminal offense.

{¶31} The first assignment of error is overruled.

{¶32} In the second assignment of error, Arafat contends that the stop exceeded the scope of a permissible *Terry* stop because Arafat was immediately removed from his vehicle and placed in handcuffs.

**{¶33}** As stated above, under the totality of the circumstances, the detectives reasonably suspected that Arafat was trafficking in drugs and, therefore, the police had the reasonable suspicion necessary to conduct an investigative stop. Detective Bovenzi testified that he arrived on scene within 20-30 seconds after the Strongsville police pulled Arafat over for questioning. The detective waited until the Strongsville police had "conduct[ed] their business" and had it "under control" before he exited his vehicle. As Detective Bovenzi explained, the Strongsville police were

> conducting an investigative stop. You know, they probably have limited information as to exactly what this was all about. [We're all] wearing plain clothes and [driving] ordinary vehicles * * * they don't know me. You know, they don't know the crew. I just didn't want — for safety reasons, we conduct ourselves accordingly.

As Detective Bovenzi approached Arafat, he immediately noticed "a fairly strong smell of marijuana emanating from the vehicle and off the person of Mr. Arafat." Detective Bovenzi then advised Arafat of his *Miranda* rights.

**{¶34}** Detective Bovenzi testified that he has been trained to identify and recognize marijuana, was very familiar with the smell of burnt marijuana, and had made previous marijuana arrests. The Ohio Supreme Court has held that "the smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to search a motor vehicle, pursuant to the automobile exception to the warrant requirement." *State v. Moore*, 90 Ohio St.3d 47, 48, 2000-Ohio-10, 734 N.E.2d 804.

**{¶35}** Thus, during the lawful stop, Detective Bovenzi smelled marijuana and had probable cause to believe that Arafat possessed marijuana, which gave police probable cause to search the car. *Id.* Based on *Moore*, then, Arafat's detention in order to effectuate a search was justified and did not violate the Fourth Amendment to the United States Constitution or

Section 14, Article I of the Ohio Constitution. *See State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985.

{¶36} Arafat gave the police consent to search his car, admitted to possessing and recently smoking marijuana, and, after conflicting stories, admitted to meeting a friend in the parking lot of the Holiday Inn to give him marijuana. Based on their belief that Arafat was involved in drug trafficking, they placed Arafat under arrest and informed him they were going to search his hotel room either with his consent or pursuant to a search warrant. During the search of the car and Arafat's person, the police discovered a small amount of marijuana, money, and the electronic key card to the Super 8 motel room.

{¶37} We recognize that the police were not permitted to arrest Arafat solely because they smelled marijuana on his person and coming from his car. The offense of possession of marijuana in an amount less than 100 grams constitutes a minor misdemeanor, R.C. 2925.11(C)(3)(a), (b), and absent proof of a valid statutory exception, an arrest for a minor misdemeanor is precluded in Ohio. *See* R.C. 2935.26. But under the totality of the circumstances presented in this case, including Arafat's actions leading up to the arrest, the smell of marijuana, the search of his car, and Arafat's conflicting and incriminating statements, the police had the requisite probable cause to arrest him.

{¶38} Thus, given the short amount of time between the time of the stop based on reasonable suspicion of criminal activity and the time Sergeant Bovenzi approached Arafat, smelled marijuana, informed Arafat of his rights, interviewed him, and arrested him based on probable cause, the warrantless stop and seizure did not violate the Ohio Constitution or the Fourth Amendment to the United States Constitution.

{¶39} The second assignment of error is overruled.

**{¶40}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

KATHLEEN ANN KEOUGH, J., and
ANITA LASTER MAYS, J., CONCUR