[Cite as *State v. Higgins*, 2016-Ohio-7890.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 104007

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MELEKE HIGGINS

DEFENDANT-APPELLANT

### JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-598858-A

**BEFORE:**   McCormack, P.J., Boyle, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   November 23, 2016

**ATTORNEY FOR APPELLANT**

Kelly A. Gallagher
P.O. Box 45551
Westlake, OH 44145


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Aqueelah A. Jordan
Assistant County Prosecutor
8th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, P.J.:

{¶1} Defendant-appellant Meleke Higgins appeals from his conviction of having weapons while under disability. For the reasons that follow, we affirm.

{¶2} Higgins was charged with having weapons while under disability in violation of R.C. 2923.13(A)(2). He moved to suppress the evidence, which included the weapon and his statement. Following a hearing, the trial court denied Higgins's motion. The court found that the police officers conducted an investigatory stop, rather than a traffic stop, and "the totality of the circumstances and the experience and training of the officers gave rise to a reasonable suspicion that criminal activity was afoot."

{¶3} Thereafter, Higgins entered a no contest plea. The court found him guilty and sentenced him to 12 months in prison.

{¶4} On appeal, Higgins raises one error for our review: the trial court erred when it denied his motion to suppress.

Testimony at the Suppression Hearing

{¶5} Bedford detective, Brian Sara, testified concerning the events of August 27, 2015. Detective Sara has been a police officer for 11 years and has received training in several areas of law enforcement, including narcotics, traffic stops, and criminal investigations. Detective Sara and his partner arrived at the Atlantic Gun & Tackle ("gun shop") on the morning of August 27, 2015, where they were following up

on a stolen gun case. The detectives parked in the parking lot and waited for the shop to open, in order to speak to the owner.

{¶6} Detective Sara testified that prior to the owner's arrival, he observed two males arrive in another car and park a couple of spaces to their right. The store owner arrived, approached the detectives in their car, and spoke with the detectives about the issue they had come to discuss with him. In the course of that conversation, Detective Sara "sensed" that the men in the other car were watching the detectives. At one point, Detective Sara's partner exited the vehicle in order to take a phone call, and he observed the license plate of the parked car in which the two men sat.

{¶7} Once the store opened, the detectives remained in their car in order to complete some paperwork. During this time, the detectives noticed that the other men did not immediately enter the store when it opened for business; rather, they remained in their car. Detective Sara found this behavior suspicious, and the detectives decided to park across the street to continue to observe the men, because this gun shop had previously been the target of "numerous robberies."

{¶8} After observing the men for approximately 20 minutes, the detectives saw another male arrive at the store on foot. The two men in the car exited the car and greeted the third man, and then the three men entered the store together. The detectives continued to observe the men. Detective Sara testified concerning the men's "odd" behavior, stating that "[a]t various points it would either be two of them, then one would come out. They went in and out of the store numerous times. At one point they were

all in the store, [and] at certain times, two of them were in the store." He stated that the detectives now suspected a possible illegal straw purchase of a firearm, where an individual purchases a firearm and then passes the firearm to another individual who may not be able to purchase the firearm himself. At this point, the detectives contacted two Southeast Area Law Enforcement ("SEALE") narcotics detectives, whose duties include investigations of illegal gun transactions.

{¶9} Detective Sara and his partner observed the SEALE detectives arrive on the scene. The SEALE detectives entered the gun shop in order to investigate whether a straw purchase was, in fact, taking place. Within one minute of the detectives' entry into the shop, Detective Sara saw the three men they had been observing exit the shop. The SEALE detectives then exited the shop and returned to their surveillance position. Detective Sara testified that, once again, he observed the three men "going in and out of the store" in different combinations of the three of them.

{¶10} Detective Sara testified that all three of the men ultimately got into the car. Shortly before they got into the car, however, he observed one of the men "take what appeared to be a handgun" and pass it to another, and the three men continued to pass the gun around to each other. Eventually, one of the men placed the gun in the waistband of his pants. The men then entered the car and left the parking lot. Detective Sara testified that based upon his training and experience, the placement of the gun in the man's waistband and his entering the car was an improper handling of a firearm in a motor vehicle.

{¶11} Bedford Heights detective, Frankie Reed, testified that he and Detective Glenn Daniels were on the scene the morning of August 27. Detective Reed has been a police officer for 19 years and has received training in basic patrol, homicide investigations, interviewing techniques, crime scene, and advanced SWAT school.

{¶12} On the day in question, Detective Reed responded to a call about suspicious behavior at the Atlantic Gun & Tackle. Upon arriving at the gun shop, Detective Reed observed three men standing around a parked vehicle. Detective Reed testified that he observed one of the men, later identified as Higgins, reach into the car and he "came out with a gun cupped in his hands." Higgins then entered the store, where he "stayed in there for awhile," and then the second man entered the store. Detective Reed observed the two men then exit the store, where Higgins handed the gun to the second individual, who then placed the gun in his waistband. Thereafter, all three men entered the car and exited the parking lot.

{¶13} Detective Reed, who observed the three men for approximately one hour, testified that the men "hanging out" in the gun store parking lot for some time, producing a handgun, entering and exiting the store, passing the handgun around, and tucking the handgun into one's waistband was "very suspicious" behavior. He also noted that while two men went into the store, the third man "kind of distanced himself from the two." Detective Reed suspected, initially, that perhaps a robbery was occurring, because the shop had been robbed many times. One of the detectives phoned the store and confirmed that the men inside the store were not robbing the store, but rather, they

were looking for a magazine for a gun that the store clerk told them the store did not have. Nevertheless, Detective Reed continued to observe them because they continued to exhibit suspicious behavior in the parking lot. The detective testified that "[j]ust because it wasn't robbed at that particular moment doesn't mean it won't be robbed later," when "they get the nerve to do it."

{¶14} When the three men left the parking lot, Detective Reed requested a marked police car to effectuate a stop. The detective explained that he and his partner were in an unmarked car and plain clothes, and the men being stopped would have no way of knowing Detective Reed and his partner were police officers. He further explained that he wished to continue his investigation of the three men with the gun. At this point in time, after running the plates through the system, the detectives only had the name of record of the owner of the vehicle, who was female. There were no females at the scene. Furthermore, Detective Reed believed that the gun was being improperly transported. He stated that based upon his 22 years in law enforcement, if the situation was on the "up-and-up," the gun would have been carried properly in the vehicle, not in one's waistband.

{¶15} Finally, Bedford Heights detective, Glenn Daniels, testified on behalf of the state. Detective Daniels has been a police officer for 21 years. He has been a detective with Bedford Heights for two years, and prior to that, he was employed as a SEALE narcotics detective. Detective Daniels is a certified firearms instructor, an

Ohio Peace Officer Training Academy ("OPOTA") instructor, and a member of the SWAT team.

{¶16} Detective Daniels testified that he and Detective Reed received a call from the SEALE narcotics detectives regarding three suspicious males at the Atlantic Gun & Tackle. He was informed that the officers on the scene suspected a possible straw purchase. When they arrived on the scene, the three males were inside the shop. After approximately 20 minutes, the detectives on the scene decided that the SEALE detectives should go inside to investigate. Detective Daniels testified that the detectives were aware that this particular shop had been robbed multiple times, it had been broken into multiple times, and "more weapons are recovered in criminal acts that were stolen from [this] particular" shop.

{¶17} Detective Daniels testified that the undercover SEALE detectives entered the shop, and within one minute of the detectives entering, the three males exited the shop. He found this behavior suspicious because the men did not immediately leave. Rather, they "just came out and stood by their car and talked amongst themselves as if they were waiting for whoever had just went in to leave again." The SEALE detectives then left the parking lot and stationed themselves in a different observation post, and the remaining detectives continued to observe the men in the parking lot.

{¶18} At that point, the individual later identified as Higgins got into the vehicle, sat inside the vehicle "for a second," and exited the vehicle. The detective stated that when he got out of the vehicle, Higgins had a gun "cupped" in his hand. Higgins then

walked back into the shop, and shortly thereafter, he was followed by a second individual. The third individual remained in the parking lot and appeared to be looking around and watching his surroundings. Detective Daniels testified that the detectives were "a little antsy" because it appeared that Higgins was hiding the gun as he walked into the shop.

{¶19} Thereafter, Detective Daniels phoned the gun shop in order to ensure they were not being robbed. He confirmed that there was no robbery in progress and he asked the clerk what the men inside were doing. He ended the phone call because the two males exited the shop. The detectives then observed the men stand around and talk to each other for some time, and then Higgins handed the gun to the second individual, who tucked the gun into his waistband and covered it with his shirt. The detectives continued to observe the men until they got into the vehicle and drove out of the parking lot. They had observed the men for "well over an hour."

{¶20} Detective Daniels testified that he believed there was a violation of the transportation of a firearm in a motor vehicle, "at least," stating that "there was a violation of weapons law occurring, either a violation of the concealed carry law, definitely a violation of transporting a firearm in a motor vehicle." He explained that the manner in which the gun was retrieved from the car, "hidden inside of a cupped hand, trying to be hidden," was unusual. Additionally, the manner in which the gun was handled, "tak[ing] the gun inside the gun store, com[ing] back out, and hand[ing] it to another guy to put inside his waistband," was unusual. He stated that the detectives

were "still trying to figure out what was going on." Detective Daniels explained that based upon his training and experience as a firearms instructor, "the way the gun was currently handled and being carried out * * * is not reasonable." Detective Daniels believed that the gun should be secured in a holster, not in one's waistband.

Law and Analysis

{¶21} In his sole assignment of error, Higgins contends that the trial court erred in denying his motion to suppress the evidence.

{¶22} An appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). We therefore accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 22 (8th Dist.). Once we accept the factual findings as true, however, we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *Burnside*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

{¶23} The Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures as, per se, unreasonable. *State v. Crawford*, 8th Dist. Cuyahoga No. 98605, 2013-Ohio-1659, ¶ 42, citing *Mapp v. Ohio*, 367 U.S. 643, 81

S.Ct. 1684, 6 L.Ed.2d 1081 (1961). An exception to the warrant requirement exists where the police officer engages in an investigatory stop, or "*Terry* stop." *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, a police officer may stop or detain an individual when the officer has reasonable suspicion based on specific, articulable facts that criminal activity is afoot. *Id.* at 30; *State v. Eason*, 8th Dist. Cuyahoga No. 103575, 2016-Ohio-5516, ¶ 15.

{¶24} Reasonable suspicion exists where there is an objective and particularized suspicion that the individual was engaged in criminal activity. *State v. Sweeney*, 8th Dist. Cuyahoga No. 97414, 2012-Ohio-3152, ¶ 12, citing *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991). It entails "a minimal level of objective justification" for making the stop. *State v. Taylor*, 106 Ohio App.3d 741, 752, 667 N.E.2d 60 (2d Dist.1995), citing *Terry* at 27. "Inarticulable hunches" or "general suspicion" is insufficient as a matter of law." *State v. Smith*, 8th Dist. Cuyahoga No. 89432, 2008-Ohio-2361, ¶ 8. On the other hand, the level of suspicion required is less than the degree of suspicion required for probable cause. *Id.* "[T]he relevant inquiry is not whether particular conduct is innocent or guilty, but [rather, it is] the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Sokolow* 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

{¶25} Moreover, the propriety of an investigative stop or detention must be viewed in light of the totality of the surrounding facts and circumstances. *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988). The circumstances must be "viewed

through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold." *Andrews* at 87-88. Accordingly, the court must take into consideration the officer's training and experience and view the evidence as it would be understood by the officers on the scene. *State v. Arafat*, 8th Dist. Cuyahoga No. 102662, 2016-Ohio-385, ¶ 23; *see also United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("[A] trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.").

{¶26} After thorough review, we find that the trial court's findings are supported by competent and credible evidence in the record. We further find that based upon the totality of the circumstances, the officers' observations created reasonable and articulable suspicion that criminal activity was afoot, thus justifying further investigation and the detention of appellant.

{¶27} We find in this case that the officers engaged in an investigatory stop. Detective Sara, one of the first detectives on the scene, testified that he observed suspicious behavior when the three men remained in the parking lot when the shop opened for business. Due to the fact that this gun shop had been the target of numerous robberies, the detectives decided to continue their observation of the men. Thereafter, the detective observed a third individual arrive and the three men continued to enter and exit the shop in various combinations. At this point, the detectives suspected a possible illegal straw purchase and contacted SEALE detectives for further investigation. Detective Sara continued to observe the men. When the SEALE detectives entered the

store to investigate whether a straw purchase was taking place, the men exited the store and remained in the parking lot. Once again, the men continued to enter and exit the shop.

{¶28} Detectives Reed and Daniels observed this behavior as well. They also observed the men pass a gun around in the parking lot, with one of the men tucking the gun in his waistband, before all three men entered their vehicle and left. Both detectives testified that because the men continued to engage in suspicious behavior, and because they suspected the gun was being improperly transported, they continued their investigation. They, therefore, requested a patrol car to effectuate the stop, as the detectives were dressed in plain clothes and driving an unmarked vehicle. These facts demonstrate that the eventual traffic stop was made for the purposes of furthering the detectives' investigation. The men were not stopped for a violation of a traffic law.

{¶29} Having found that the officers engaged in an investigatory stop, we must now determine whether, based upon the totality of the circumstances, the officers' observations created reasonable and articulable suspicion that criminal activity was afoot, thus justifying further investigation and the resultant traffic stop.

{¶30} Here, Detectives Reed and Daniels responded to a call from a Bedford police detective regarding suspicious behavior at Atlantic Gun & Tackle. Upon arriving at the gun shop, Detectives Reed and Daniels observed the three men for over an hour. During this time, they observed the following: three men standing around a parked car in the parking lot; Higgins cupping a gun in his hands; the men passing the

gun around; Higgins and the second man entering and exiting the shop, while the third man remained in the parking lot, looking around and watching his surroundings; and one of the men eventually tucking the gun in his waistband and covering it with his shirt, before entering their vehicle and leaving the parking lot.

{¶31} Based upon this behavior and the detectives' knowledge that the gun shop was the target of numerous robberies, it had been broken into multiple times, and it had, as a result, supplied stolen weapons used in many crimes, the detectives suspected a possible robbery. Detective Daniels phoned the shop to confirm that it was not presently being robbed. Higgins contends that because the detectives confirmed the shop was not being robbed, their suspicion had dissipated. The detectives' suspicion of criminal activity was not dispelled, however, because they continued to observe the men's suspicious behavior in the parking lot after the phone call, as noted above, and Detective Reed stated that he was concerned about the possibility of a future robbery, when the men "got the nerve to do it."

{¶32} Detective Daniels also testified that they further suspected a violation of a weapons law, either carrying a concealed weapon or improperly transporting a firearm in a motor vehicle. He testified that the manner in which the men handled the gun, by hiding it inside of a cupped hand and passing it to another individual who tucked the gun in his waistband was suspicious. He further testified that based upon his experience and training as a firearms instructor, he believed the gun should have been secured in a holster.

**{¶33}** Higgins contends that because the officers had no personal information on the men, such as their identities, they had no reason to believe they were violating the laws regarding concealed carry.

**{¶34}** R.C. 2923.12(A)(2) provides that "[n]o person shall knowingly carry or have, concealed on the person's person or concealed ready at hand * * * [a] handgun other than a dangerous ordnance." However, the statute further provides that R.C. 2923.12(A)(2) does not apply to anyone who is carrying a "valid concealed handgun license." R.C. 2923.12(C)(2).

**{¶35}** R.C. 2923.16(B) prohibits transporting a gun by way of a motor vehicle that could be accessed by the driver or passenger without getting out of the vehicle. R.C. 2923.16(C) specifies how a gun is to be transported, stating that "[n]o person shall knowingly transport or have a firearm in a motor vehicle, unless the person may lawfully possess that firearm under applicable law of this state or the United States, the firearm is unloaded, and the firearm is carried" in one of four ways: in a closed package, in a compartment that can be reached only by leaving the vehicle, in plain sight and secured in a rack, or in plain sight with the action open or the weapon stripped. These divisions do not apply where "the person transporting or possessing the handgun is carrying a valid concealed handgun license" and the individual "is not knowingly in a place described in [R.C. 2923.126]," such as a courthouse, police station, or school. R.C. 2923.16(F)(5).

**{¶36}** In accordance with the above, Ohio law prohibits the carrying of a concealed weapon, unless the individual possesses a license to carry a concealed weapon. Here, the detectives testified that Higgins "cupped" the gun, as if to "hide" it. Concealing a gun in this manner is sufficient to constitute a violation of R.C. 2923.12. *See State v. Sims*, 8th Dist. Cuyahoga No. 89261, 2007-Ohio-6821. Therefore, unless Higgins possessed a valid license to carry a concealed weapon, it is possible that Higgins was violating the law.

**{¶37}** Police officers, however, are not required to verify the existence of a concealed carry license prior to a lawful *Terry* stop. *See State v. Taylor*, 8th Dist. Cuyahoga No. 92382, 2009-Ohio-5822, ¶ 8. Where a police officer has reasonable suspicion that an individual has committed a violation of the concealed carry laws, the officer is entitled to detain the individual in order to investigate that possibility, including whether the individual possesses a valid concealed carry license. *Id.*; *see State v. Williamson*, 2d Dist. Montgomery No. 25479, 2014-Ohio-325, ¶ 24. The defendant bears the burden of establishing that he had a valid concealed carry license with him at the time he was stopped. *State v. Meyers*, 11th Dist. Lake Nos. 2013-L-042 and 2013-L-043, 2014-Ohio-1357, ¶ 43 (where the defendant was charged with a violation of improperly transporting a firearm in a motor vehicle, it is the defendant's burden to establish that he had his concealed carry license with him at the time he was stopped, which would have rendered R.C. 2923.16(C) inapplicable to him).

**{¶38}** Here, the detectives had a reasonable suspicion, based upon the men's going in and out of the gun shop, "cupping" the gun as if to hide it, passing the gun around, and then tucking in the waistband and covering with a shirt, that the men were engaged in criminal activity, namely carrying a concealed weapon. This suspicion was sufficient to justify conducting a *Terry* stop in order to investigate.

**{¶39}** Higgins also contends that the officers mistakenly believed that even if an individual possesses a concealed carry permit, the gun must be carried in a holster while transporting. Higgins argues, therefore, that the traffic stop was based upon a mistake of law and, thus, the officers lacked reasonable suspicion. In support of his position, Higgins cites to *State v. Fears*, 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930. In *Fears*, the defendant was stopped by the police for what they believed was a singular violation of Cleveland Codified Ordinances. The police learned after the fact, however, that they were wrong about the defendant's conduct being a violation of the city's ordinances. This court held that the officers' mistake of law regarding the violation meant that the officers lacked a reasonable, articulable suspicion for the stop. *Id.* at ¶ 13.

**{¶40}** Higgins's reliance upon *Fears* is misplaced. *Fears* involved a traffic stop, where the police officers' only articulable facts regarding criminal activity was the traffic violation that proved not to be a violation at all. Here, however, the detectives conducted an investigatory stop, which resulted from the detectives' suspicion of several crimes. In their observation that exceeded one hour, the detectives observed the

following: three men go in and out of the gun shop numerous times and in different combinations of the three of them; Higgins "cupping" the gun in an effort to hide it; the men passing the gun around; and the third individual placing the gun in his waistband and covering it with his shirt. In light of the men's suspicious behavior, and the detectives' knowledge of previous criminal activity at this gun shop, the detectives had reasonable suspicion of several possible crimes, including robbery, carrying a concealed weapon, and improperly transporting/handling a weapon. Therefore, even if the detectives were mistaken regarding whether Higgins violated R.C. 2923.16, this mistake is not fatal to their suspicion of other criminal activity afoot.

{¶41} Based upon the foregoing, and viewed in light of the totality of the surrounding facts and circumstances and the extensive training and experience of the investigating officers, we find that the officers had a reasonable suspicion that criminal activity was afoot. The investigatory stop of Higgins was therefore lawful, and the trial court's denial of Higgins's motion to suppress was proper.

{¶42} Higgins's sole assignment of error is overruled.

{¶43} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, PRESIDING JUDGE

MARY J. BOYLE, J., and
SEAN C. GALLAGHER, J., CONCUR